# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ELIZABETH Z. CASAUS,

        Plaintiff,

v.                                                       No. CIV 03-900 BB/LFG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION[1]

Plaintiff Elizabeth Z. Casaus ("Casaus") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Casaus was not eligible for disability benefits. Casaus moves this Court for an order reversing the Commissioner's final decision, or alternatively, to remand for a rehearing. [Doc. 10.]

Casaus was born on March 25, 1944 and was 58 years old when the administrative hearing was held. She has a tenth grade education. Casaus' past relevant work experience was as a nursing home activity director and a rural route mail carrier. [Tr. at 90.]

---

[1]Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

On March 28, 2002, Casaus applied for disability benefits, alleging an onset date of January 24, 2002 due to a diagnosis of breast cancer.  [Tr. at 60, 71.]  Casaus had a lumpectomy and some re-excision procedures for her breast cancer in early 2002 and then underwent chemotherapy and radiation therapy treatments.  [Tr. at 13, 132, 162, 163, 166, 169, 212.]  Fortunately, her cancer does not appear to have recurred.

Casaus' application for disability benefits was denied at the initial and reconsideration stages, and she sought timely review from the ALJ.  An administrative hearing was held on January 29, 2003 in Roswell, New Mexico.  In a decision, dated March 26, 2003, ALJ David R. Wurm found that Casaus was not disabled within the meaning of the Social Security Act ("the Act") and denied the benefit request.  Casaus challenged this determination to the Appeals Council which denied her request for review on June 4, 2003.  [Tr. at 4.]  This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove her impairment is "severe" in that

---

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[4]20 C.F.R. § 404.1520(b) (1999).

it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[5] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[6] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[7]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[8] age, education and past work experience, she is capable of performing other work.[9]  If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[10]  Here, Judge Wurm made his determination of non-disability at step four.

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than

---

[5]20 C.F.R. § 404.1520(c) (1999).

[6]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[7]20 C.F.R. § 404.1520(e) (1999).

[8]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[9]20 C.F.R. § 404.1520(f) (1999).

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

3

a mere scintilla, but it need not be a preponderance.  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th

Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).  The Court's review of the

Commissioner's determination is limited.  Hamilton v. Secretary of Health & Human Servs., 961 F.2d

1495, 1497 (10th Cir. 1992).  The Court's function is to determine whether the record as a whole

contains substantial evidence to support the Commissioner's decision and whether the correct legal

standards were applied.  Id. at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for

purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the
> evidence, but an ALJ is not required to discuss every piece of
> evidence.  Rather, in addition to discussing the evidence supporting
> his decision, the ALJ must discuss the uncontroverted evidence he
> chooses not to rely upon, as well as the significantly probative
> evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If

supported by substantial evidence, the decision of the Commissioner is conclusive and must be

affirmed.  The Court cannot re-weigh the evidence or substitute its judgment for that of the

Commissioner.  Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After reviewing Casaus' medical records, symptoms and complaints, the ALJ rejected

Casaus's claim for benefits at step four, concluding that based upon Casaus' age, education, work

history and residual functional capacity, she could return to her past relevant work as she described

that work.  [Tr. at 15.]  In reaching this decision, Judge Wurm made the following findings:

(1) Casaus had not engaged in substantial gainful activity since her alleged onset of disability;

(2) Casaus had an impairment or combination of impairments considered "severe"; (3) the severe

impairments did not meet or medically equal any of the listed impairments; (4) Casaus' allegations

4

regarding her limitations were not well supported by the medical evidence and were not totally credible; (5) Judge Wurm carefully considered all of the medical opinions in the record regarding the severity of Casaus' impairments; (6) Casaus had the RFC for light exertional level work with the additional limitation of only occasional fingering or fine manipulation; (7) her past relevant work as a nursing home activity director and a rural route mail carrier, as she described those jobs, did not require performance of work-related activities precluded by her RFC; and (8) Casaus' medically determinable impairments did not prevent her from performing her past relevant work. [Tr. at 15-16.] Ultimately, Judge Wurm concluded that Casaus was not disabled as defined by the Social Security Act at any time through the date of his decision. [Tr. at 16.]

In this appeal, Casaus argues first that the ALJ's decision was not supported by substantial evidence. More specifically, she claims that the ALJ erred in evaluating her depression which she contends meets or equals listing 12.04. Casaus argues that Judge Wurm erred in evaluating her cancer impairment, its treatments and its residual effects and failed to acknowledge her treating physician's reports. Casaus asserts that the ALJ erred in evaluating the arthritis impairment, in finding her not credible, in evaluating her RFC, in concluding that she could do previous work as a mail carrier and in not applying the grids. Finally, Casaus claims that the ALJ erred in failing to develop the record. [Doc. 11.] The Commissioner claims that Casaus did not meet her burden of proving that she was precluded from performing her past relevant work for the required continuous 12-month period beginning during the adjudicated period (January 24-March 31, 2002).[11] In addition, the

---

[11]The government states in its responsive brief that Casaus last met the insured status requirements for her claim on March 31, 2002. [Tr. at 67.] Thus, she carried the burden of demonstrating that she was precluded from performing her past sedentary and light work for the required continuous 12-month period beginning during the adjudicated period of January 24, 2002 to March 31, 2002. Plaintiff does not address or dispute this argument in her reply brief. In order to be eligible for DIB, a claimant must establish the existence of a disability on or before the date on which her insured status expires. 20 C.F.R. § 404.131. The Commissioner calculates a claimant's

Commissioner argues that the non-disability finding was consistent with regulatory criteria.  [Doc. 12.]

### Summary of Casaus' History and Medical Care

Casaus' medical records span a two-year period – from 2002 to 2003.  From 2000 to 2002, she worked as a rural route mail carrier for four hours a day, six days a week.  She sorted mail, tied bundles, and delivered mail to rural route mail boxes.  [Tr. at 92.]  The position did not require much lifting or walking.  [Tr. 28.]  From 1976 to 1996, she worked as an activity director at a nursing home.  [Tr. at 90.]  That job required some standing and sitting but no lifting.  [Tr. at 28.]

Casaus quit her mail carrier job when she was diagnosed with breast cancer in early 2002. [Tr. at 136, 162.]  After a needle biopsy, the pathology report showed infiltrating ductal carcinoma of the left breast that was well differentiated.  [Tr. at 140.]  Casaus' physician believed there was a good chance of curing the cancer because it was well differentiated.  [Tr. at 158.]

In a Disability Report, dated March 14, 2002, Casaus stated that she had just been diagnosed with breast cancer on January 22, 2002 and was unable to work as of January 24, 2002.  She was to undergo surgery, chemotherapy and radiation therapy.  [Tr. at 70.]  Dr. David Turner wrote a note that was attached to the Disability Report stating that Casaus would be unable to work for 6 to 18 months.  [Tr. at 78.]

It appears from the medical records that Casaus underwent several excisional procedures to get complete clearance of the tumor from the breast.  [Tr. at 132, 163.]  On March 22, 2002, the pathology report showed that she was negative for metastases on her lymph nodes.

---

insured status in accordance with regulations set out at 20 C.F.R. § 404.120, *et seq.*  Thus, assuming Casaus' insured status expired on March 31, 2002, (and based on her application for DIB on January 24, 2002), she must prove a disability began January 24-March 31, 2002.

On March 28, 2002, Casaus filed her application for disability benefits.  [Tr. at 60.]  During a face to face interview with disability services, the interviewer noticed no limitations although she observed that Casaus was thin built and frail looking.  [Tr. at 80.]  On March 28, 2002, Casaus wrote that she had become weaker, fatigued and depressed.  She needed more assistance and was very upset thinking about her financial situation.  She was very weak physically and had lost weight and hair.  She was unable to think clearly and she cried frequently.  She described herself as depressed but wrote that he doctor had not restricted her and had told her to do things as tolerated.  Her daughter was helping her with her personal needs.  [Tr. at 84.]

On April 3, 2002, Dr. Turner wrote to Dr. Sanyal, describing Casaus' history and asking if he would treat her with chemotherapy after an infection post excision procedure had cleared up.  [Tr. at 157.]

On April 6, 2002, Mary Segura filled out a third- party questionnaire on behalf of Casaus, but she answered most questions with "I don't know."  Ms. Segura observed that Casaus did not seem as happy as she had before and that she was quiet, but she did not know about any problems Casaus had or how she was managing.  [Tr. at 116.]  Segura did not know if Casaus could work.  She did not observe Casaus to behave in an unusual way or inappropriately.  Casaus seemed worried and fearful because of her illness.  [Tr. at 116.]

On April 8, 2002, Casaus filled out a daily activities questionnaire.  She got up in the mornings, groomed herself with her right hand (she is right handed).  Her daughter had taken over the daily chores and food preparation.  Casaus was able to do crossword puzzles.  She did left arm exercises.  Her spouse took her to the doctor.  She was able to do some grocery shopping but drove very little.  Casaus did not use a walker, cane or wheelchair.  She could walk slowly about ½ block

only.  She read the newspaper but could concentrate only for short times.  She watched a little television.  She visited with family and friends.  [Tr. at 106.]

On April 10, 2002, Dr. Sanyal noted Casaus had mild fatigue with surgery stress and mild anorexia.  She was on Xanax for anxiety and Cephalexin for a possible wound infection.  She had lost 3-4 pounds.  Depression and insomnia were noted.  Casaus had a 80-85% chance of being disease free over the next 10 years.  [Tr. at 186.]

Also on April 10, Dr. Turner noted that Casaus might be sufficiently healed up from the infection in her breast cavity to begin chemotherapy in two to three weeks.  [Tr. at 164.]  On April 24, 2002, a body bone scan was performed to rule out any bony metastatic disease.  The bone scan showed mild scoliosis in her lumbar spine, and mild increased activity in the right TMJ, both knees and both shoulders.  But there was no abnormal areas in the bony skeleton to suggest metastatic disease.  [Tr. at 142, 169.]

On April 24, 2002, Dr. Sanyal noted that Casaus had lost three pounds.  She had no hair loss, no depression or change in sleep pattern.  She was going to proceed with another re-excision procedure on the following day, and he would see her back in two weeks to initiate chemotherapy.  [Tr. at 185.]

On May 3, 2002, Dr. Turner noted that the breast site was leaking a little clear fluid but there were not signs of infection.  The margin was completely negative for signs of remaining cancer.  He stated that overall things were doing well.  [Tr. at 165.]

In a May 12 medical record, Dr. Sanyal discussed the choices of treatment with Casaus.  She wanted the most aggressive intervention.  [Tr. at 184.]  On May 22, 2002, Dr. Turner removed the Groshong stitch.  The cavity looked well healed and there was no infection.  She was to continue the

8

chemotherapy which she was tolerating very well.  She seemed pretty happy otherwise.  [Tr. at 165.]

On May 24, 2002, however, Dr. Sanyal diagnosed her with neutropenia[12] and advised her she was at risk of contracting severe life threatening infections.  She was to have the drainage cultured and to start on a broad spectrum of antibiotics.  [Tr. at 182.]

On May 29, 2002, Dr. Sanyal noted that Casaus was fatigued and had decreased activity.  She was up and around more than 50% of the time.  She was depressed.  She had no hair loss at this time.  Her weight was down to 103.5 pounds and she had lost 6 pounds.  On May 31, Dr. Turner noted that Casaus had developed an infection in the biopsy site.  She was going to go off the chemotherapy for a week and then proceed as she improved.  [Tr. at 165.]

On or about May 31, 2002, two medical consultants reviewed Casaus' records.  Dr. Eileen Brady noted Casaus' diagnosis and subsequent re-excision procedures, along with the chemotherapy treatment and possible radiation with Tamoxifen therapy.  Dr. Brady stated that Casaus was depressed over her diagnosis.  Still, Casaus did not spend more than 50% of her time in bed and traveled three hours round trip to see her doctor once a week.  Her condition, in Dr. Brady's opinion, did not meet or equal the listing for breast cancer.  Dr. Brady observed that the next six months would be difficult for Casaus, but that she was expected to recover within one year from her diagnosis and that she would not have long-term limitations as a result of her diagnosis.  [Tr. at 153.]

On this same record, consultant Dr. David Green wrote that Casaus had started chemotherapy and was having trouble with a wound infection.  He also stated that there is a chance that if she has

---

[12]A decrease in the number of neutrophilic leukocytes in the blood, creating risk for recurrent infections. Dorland's Illustrated Medical Dictionary (26th ed.), p. 891.

complications her care could take more than one year.  [Tr. at 153.]  However, he affirmed the assessment of Dr. Brady.  [Tr. at 153.]

On May 31, 2002, Dr. Turner wrote to Dr. Sanyal stating that they needed to hold off the chemotherapy until the wound healed.  [Tr. at 156.]

On June 3, 2002, consulting psychologist Gabaldon conducted a psychiatric review on Casaus.  She had a non-severe affective disorder of depression.  In reviewing the § 12.04 criteria, he concluded Casaus had mild limitations and no repeated episodes of decompensation.  "Ms. Casaus is depressed due to her physical problems.  There is no evidence of thought disorder, cognitive limitation or ongoing substance abuse.  Her activities appear limited due to her cancer."  [Tr. at 221-33.]

Casaus was not able to reinitiate the chemotherapy in early June 2002, but by June 11, 2002, the doctors felt they should begin the therapy again.  As of June 11, Casaus was feeling well and had a good appetite.  She had lost 6 pounds and had mild fatigue.  She was up and around most of the time.  She complained of depression and insomnia but had no swollen nodes.

On July 29, 2002, Dr. Sanyal wrote a letter to whom it may concern stating that Casaus was receiving chemotherapy for breast cancer and that she would be done by mid-September, 2002.  Then she would have 6-7 weeks of radiation and be taking Tamoxifen for five years.  Dr. Sanyal stated that after this therapy, most patients need 1-2 months to recover from side effects.  Even after therapy, Casaus would need periodic monitoring and continued to be at risk for recurrence of breast cancer for a very prolonged period of time.  [Tr. at 212.]

Casaus completed her course of chemotherapy in September and by October 31, 2002, she had started radiation therapy.  She had morning stiffness in her joints.  [Tr. at 13.]

On January 9, 2003, Casaus saw Dr. Jayashree Sinha in Portales, New Mexico. She was sent to Dr. Sinha by Dr. Felberg regarding chronic joint pain that had responded to Prednisone. Casaus had complained of joint pain for months in her wrists, elbows, shoulder, knees and ankles. She felt stiffness for 30 minutes to an hour or more. She had tested negative for a Rheumatoid Arthritis ("RA") factor but the doctor believed she had RA because she met more than three criteria for it. Dr. Sinha started Casaus on Methotrexate and had her decrease the Prednisone. [Tr. at 235-36.]

On January 29, 2003, Casaus attended the administrative law hearing in Roswell before Judge Wurm. She was unrepresented and stated that she was the only one who could tell the ALJ how she felt. [Tr. at 25.] She was taking Tamoxifen daily at this time and had no side effects although she said there were possible side effects. [Tr. at 29.] Her left arm was still affected by her breast cancer but she was right handed. [Tr. at 30.] She could lift her left arm to a certain extent. [Tr. at 30.] She believed her joints were swollen due to RA, but the medication helped her and killed the pain. [Tr. at 30.] She was taking Xanax for anxiety, and her anxiety was related to the cancer. [Tr. at 30.] She described feeling depressed and fearful, and she was having crying spells. She had financial concerns as well, and her husband had walked out on her. [Tr. at 31.]

Casaus' daughter helped her with the daily chores. Casaus got up every morning and fixed coffee. Her daughter fixed her breakfast and forced her to eat. Casaus said she was not hungry because she was depressed. She tried to clean her house a little and washed dishes. She listened to television, particularly to the news, drove to the post office and went to the grocery store. She had a driver's license. Casaus was able to do crossword puzzles and listen to soft music. [Tr. at 34.] She visited with her brother and friends and went to church on Sundays. [Tr. at 34.] She was able to

dress herself and take showers.  [Tr. at 35.]   She could sit and walk some.  She had some trouble

lifting heavy things with her hands.  [Tr. at 37.]

Casaus was going to be on the Tamoxifen for five years.  Her latest mammograms and tests

results had been all right.  [Tr. at 36.]  Although she did not believe she could get back her old mail

handler job, she stated that if she could obtain the position, she believed she could probably do the

job.  [Tr. at 38.]

On February 6, 2003, Dr. Sinha noted that Casaus' joint pains were better after starting the

Methotrexate.  There are no subsequent medical records in the file.

On March 26, 2003, ALJ Wurm issued his decision denying Casaus benefits.  He compared

her breast cancer to listing 13.09 but found it was operable and non-recurring.  Her cancer had

responded well to treatment.  Judge Wurm compared her RA to listing 14.09 but found she had had

good results with the medication.  Judge Wurm noted that there was minimal documentation of

Casaus' emotional response to her physical condition.  She appeared to have situational depression.

He considered her anxiety and different listing criteria but she did not meet the criteria.  Judge Wurm

concluded that she had the RFC for light exertional level with the limitation of only occasional

fingering or fine manipulation.  Based on her description of her prior relevant work, he concluded that

her RFC did not preclude her from performing that work.  [Tr. at 8-15.]

In her request for review, Casaus stated that she had increased chronic joint pain.  She was

using Methotrexate but her pain had increased.  She was depressed and had increased the Xanax she

was taking.  She feared that her cancer would recur and did not think she could not work feeling the

way she did.  [Tr. at 6.]  The Appeals Council denied her request for review.  [Tr. at 4.]

## Discussion

### I.    MENTAL IMPAIRMENT

A claimant has the burden of proving that her condition meets or equals a Listing for purposes of step three analysis. <u>Sullivan v. Zebley</u>, 493 U.S. 521, 110 S.Ct. 885, 891-92 (1990). In order to satisfy his burden, the claimant must demonstrate that her impairment meets or equals all of the specified medical criteria for the Listing in question. If the impairment meets only some of the criteria, regardless of severity, a Listing will not be met. <u>Id.</u>, 110 S.Ct. at 891.

At step three, the ALJ must determine whether the "medical findings" at least equal in severity and duration as those criteria set forth in a Listing. <u>Bernal v. Bowen</u>, 851 F.2d 297, 300 (10th Cir. 1988). "'Medical findings' include symptoms (claimant's own description of his impairments), signs (observations of anatomical, physiological and psychological abnormalities which are shown by clinical diagnostic techniques) and laboratory findings." <u>Id.</u> (<i>citing</i> 20 C.F.R. §§ 404.1526(a); 404.1528(a)). The claimant's descriptions, alone, are insufficient to establish the criteria of a Listing. <u>Id.</u> The step three analysis requires a comparison of those medical findings and evidence with the Listing criteria.

Plaintiff first asserts that there was an "overabundance of evidence"[13] demonstrating  her mental impairment.  She argues that her "classic symptoms and manifestations meet or exceed Listing 12.04."  In the ALJ's decision, he stated that there was only minimal documentation of Casaus' emotional response to her physical condition.  For example, he noted that her situational depressive symptoms were responsive to medication and should resolve as her physical ailments resolve.  Judge Wurm specifically considered Casaus' affective and anxiety-related disorders in terms of Listings §§ 12.04 and 12.06 but concluded that they did not rise to listing level severity.  The "B" criteria for these listings were not met above the mild level and the "C" criteria were not even approached.  [Tr. at 13.]

Because Plaintiff restricts her argument to whether her depression/anxiety met listing § 12.04, the Court examines only § 12.04.  Under that listing, the individual's affective disorder is characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  "Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." § 12.04.  To satisfy the level of severity, both A and B criteria must be met.  The "A" criteria include pervasive loss of interest in almost all activities, appetite disturbance, sleep disturbance, psychomotor agitation, decreased energy, feelings of guilt or

---

[13]The Court finds some of the stated "overabundance of evidence" to be slightly exaggerated by counsel. For example, counsel states that on April 8, 2002, a doctor has present (sic) diagnosis of depression, citing to a daily activities form filled out by Casaus in which she indicates only that she was prescribed Xanax for one month for "anxiety/depress".  A statement such as this by the claimant does not necessarily mean that a physician diagnosed her with depression.  In addition, counsel cites a May 8, 2002 record stating that "[d]efendant's own consultants admit a diagnosis of depression is present and could be disabling and of undetermined duration."  That cited record is a CAASE Development Sheet that appears to document internal notes and questions by disability personnel.  The note in question states "[w]ith regard to mental function claimant is diagnosed with 'depression and insomnia' secondary to her cancer and is prescribed Xanax prn.  Although this might resolve within 12 months (along with cancer) given possibility of recurrence might it be/become more of a chronic depression/anxiety.  Please assess and advise.  thank you."  It is not clear who wrote this note, and if anyone answered the question. Another copy of this same page [tr. at 216] states in someone's unsigned writing "time will tell."  This simply is not an "overabundance of evidence" confirming Casaus' listing level mental impairment.

worthlessness, difficulty concentrating, thoughts of suicide or hallucinations, etc.  In addition to demonstrating "A" criteria, "B" criteria must be satisfied.  Two of the following must be demonstrated: marked restriction of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence or pace, or repeated episodes of decompensation, each of extended duration.

Here, the Court concludes that substantial evidence supports the ALJ's determination that Casaus' mental impairment did not meet or exceed listing 12.04 and that there was no error.  Without a doubt, a diagnosis of cancer is a terrifying experience.  The uncertainty over the disease's progression and the realities that one faces with such an illness is not only upsetting but devastating.  Fear for the sense of loss loved ones will experience, to say nothing of one's own fears at facing mortality can be mind-numbing.  However, a diagnosis of cancer does not, *per se*, equate to a mental impairment that meets or exceeds the requisite 12.04 listing.

Moreover, the January-March 27, 2002 medical records make no notation whatsoever about Casaus' mental outlook.  Casaus' subjective evaluation of her mental status as of March 28, 2002 was that she felt depressed and was concerned about her financial situation.  She had stopped working and was undergoing surgeries and treatment for her cancer.  She was not able to think clearly and she was crying frequently.  [Tr. at 84.]  Casaus' reaction is a normal, indeed, anticipated reaction to such frightening news.  However, she also wrote at one point that the doctor had not restricted her and had advised her to do whatever she could tolerate.  [Tr. at 84.]

In subsequent medical records from April through October 2002, when she was receiving radiation therapy, there is little mention of depression and anxiety.  As of April 8, she was able to get up and groom herself.  She did crossword puzzles and some grocery shopping.  She was able to eat

15

three times a day and walk ½ block.  She read the newspaper and watched a little television.  She visited with friends and family.  [Tr. at 106.]

Casaus, of course, was experiencing expected fatigue after surgeries.  However, on April 24, Dr. Sanyal noted that while she had lost a few pounds, she had no hair loss, was not depressed, and there was no change in her sleep pattern.  [Tr. at 185.]  Dr. Turner had prescribed her an anti-anxiety medication, Xanax, on April 3, 2002 for a one month period of time.  [Tr. at 111.]  But there are few, if any, notations in the medical records of severe depression or anxiety.  There are no referrals to a psychologist for counseling and no prescriptions noted for anti-depressants.

Moreover, on June 3, 2002, Ph.D Gabaldon conducted a psychiatric review and found that Casaus' affective disorder was non-severe.  She was only mildly restricted in daily activities in maintaining social functioning and in maintaining concentration, and there were no repeated episodes of decompensation.  [Tr. at 221.]  In other words, Casaus was able to rise above this difficult situation and cope with her medical condition.  Gabaldon concluded that Casaus was depressed due to her physical problems and that there was no evidence of thought disorder or cognitive limitations.  Her limitations related to her cancer.  [Tr. at 233.]

On June 11, 2002, despite suffering from some post-excision procedure infections, Casaus was observed by her doctor as "feeling well."  She had a good appetite and no symptoms.  While she had lost six pounds, she only had mild fatigue.  She was up and around most of the time.  Dr. Sanyal, however, did note that she was depressed and had insomnia.  [Tr. at 177.]

On July 27, 2002, Dr. Sanyal wrote a letter on behalf of Casaus setting forth the predicted course of her treatment and that she would continue to need monitoring and would continue to be

at risk for recurrence of cancer.  Nonetheless, nothing in the letter states that Casaus is unable to work during this time or that she was severely depressed.  [Tr. at 212.]

Generally speaking, Casaus' complaints of depression and anxiety are subjective in nature. There are no references in the objective medical record that physicians concluded that she was depressed to the point of being unable to work or of needing psychiatric care.  It is true that the absence of evidence of a mental impairment is not sufficient evidence on which an ALJ can rely. Miller v. Chater, 99 F.3d 972, 976 (10th Cir. 1996).  In addition, subjective complaints can be used to diagnose both physical and mental impairments.  Flint v. Sullivan, 951 F.2d 264, 267 (10th Cir. 1991).

Here, however, it appears that the ALJ did take into account Casaus' subjective complaints of depression, and he did not rely merely on a lack of evidence of a mental impairment.  There is little mention of depression and anxiety, either by the claimant subjectively or in the objective medical record.  There are no referrals for testing as to Casaus' depression or anxiety.  There are few prescriptions related to a mental impairment, and even then the prescriptions for anxiety appear to be limited in time.  Moreover, there are notes in the objective medical record that Casaus is not depressed and is doing fairly well even during treatment for her cancer.  According to her daily activities, while somewhat limited in relation to surgical procedures, she still was quite active and able to visit with friends and go on long drives to doctor's appointments.  Finally, the consulting psychologist found that any mental restrictions that Casaus did have were no more than mild, and these conclusions were relied upon by the ALJ.  Thus, the Court concludes that substantial evidence supports Judge Wurm's findings that Casaus' mental impairment did not meet or equal a listing.

17

Alternatively, although not explicitly set forth in the ALJ's opinion, it appears that even if Casaus had presented evidence of a mental impairment, she would have had to demonstrate the existence of a *disabling* mental impairment before the expiration of her insured status. Therefore, she would have had to shown she was disabled by anxiety or depression before the end of March 2002, and she presented no evidence, of such a condition. *See* <u>Kepler v. Chater</u>, 68 F.3d 387, 389 (10th Cir. 1995) (to be entitled to disability benefits, the claimant must prove she was totally disabled by the date her insured status expired); <u>Potter v. Sec'y of Health & Human Services</u>, 905 F.2d 1346, 1347, 1348-49 (10th Cir. 1990) (same).

## II.    CANCER IMPAIRMENT, TREATMENT, RESIDUAL EFFECTS

Casaus argues that her treating physician, Dr. Turner opined that she was totally disabled as of March 14, 2002 and that the ALJ failed to acknowledge this report. The claimant cites to two records. First, Dr. Turner wrote a note that was included in Casaus' disability report stating that she "has breast cancer and the treatment with surgery from 3/7 to 3/19 and then chemotherapy and radiation will make her unable to work for 6-18 months." [Tr. at 78.] There is nothing certain about Dr. Turner's projection of when Casaus might be able to work. It clearly is an estimate only.

Casaus also cites Dr. Sanyal's July 29, 2002 letter to whom it concerns setting forth her plan of treatment, that she would be on medication for Tamoxifen for five years, that most patients need one to two months to recover after prolonged therapy, and that Casaus would need periodic monitoring and would be at risk for recurring cancer over the next 5-10 years. [Tr. at 212.] Nothing in this latter note indicates that Casaus is unable to work during any of this time period.

The ALJ specifically mentioned Dr. Sanyal's note but did not explicitly discuss Dr. Turner's earlier note. However, Judge Wurm thoroughly considered the medical records concerning Casaus'

18

diagnosis and treatment of her cancer.  For example, he noted that Dr. Turner operated on Casaus on March 18 and that on April 24, 2002 the body scan did not reveal any metastatic disease.  [Tr. at 12.]  Judge Wurm analyzed Dr. Sanyal's conclusion that Casaus had recovered uneventfully from her surgery and that she was asymptomatic on April 10, 2002.  [Tr. at 12-13.]  On September 16, 2002, Casaus had completed her chemotherapy and was "doing well" in her physician's opinion.  [Tr. at 13.]  While Dr. Turner initially estimated that Casaus might not be able to work anywhere from 6 to 18 months, based on a thorough exploration of the medical records, Judge Wurm appropriately noted that Casaus had responded well to therapy and had made a recovery within 12 months of her initial diagnosis.  [Tr. at 13.]

Not only do the treating records support this conclusion, but the state agency consulting physicians also determined or projected that Casaus would recover from her surgery and subsequent treatment within 12 months of the date of her original diagnosis.  [Tr. at 12,  153.]  For example, consulting physician Eileen Brady stated that Casus was fatigued as of May 31, 2002, but she did not spend more than 50% of her time in bed.  She was depressed over the diagnosis but there was minimal weight loss.  While the next six months would be difficult, Dr. Brady expected Casaus to recover by one year from the date of her diagnosis and expected her not to have long term limitations.

The Court concludes that the ALJ properly considered the treating physician's reports and opinions and that substantial evidence supported his conclusion that Casaus' cancer and treatment did not meet or equal a listing.  Moreover, there was no error made by the ALJ in his analysis of Casaus condition.

Alternatively, the Court again notes that assuming that Casaus' insured status expired at the end of March 2002, Casaus failed to present evidence that she was disabled by her diagnosis of left

breast cancer before that date and for a continuous period of 12-months. "Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that . . . has lasted or is expected to last for a continuous period of not less than 12 months." [Tr. at 11.] For all these reasons, substantial evidence supports the ALJ's non-disability determination in relation to Casaus' diagnosis of breast cancer.

## III.   <u>ARTHRITIS</u>

Casaus argues that her arthritic impairment and pain precluded her from being able to work and that the ALJ erred in evaluating this impairment. It appears that Judge Wurm actually gave Casaus the benefit of the doubt in considering this alleged impairment even though it did not occur until almost nine months after her application for DIB and the expiration of her insured status.

The first records indicating complaints of arthritis appear in early 2003. Actually, near the end of 2002 and her radiation treatment, one medical record notes complaints of joint stiffness in the morning. [Tr. at 13, 248.] In January 2003, she was given steroid treatment to which she responded positively with respect to her joint pain. Thus, her physician concluded that she had rheumatoid arthritis ("RA") even though she had tested negatively for it. [Tr. at 235-36.] The radiology report from this time period shows mild osteoporosis and mild narrowing in her hands along with mild degenerative changes of radiocarpal joints. [Tr. at 238.]  Her physician prescribed Methotrexate, a medication typically used for RA patients, and Casaus did very well on it. Her joint pain was improved with this medication. [Tr. at 235.] Most, if not all of these records, were discussed by the ALJ in his decision. [Tr. at 13-14.]

The Court again concludes that there is substantial evidence supporting the ALJ's conclusion that Casaus' RA or arthritic condition did not prevent her from working. In addition, Casaus did not

present evidence of a disabling condition for a continuous period of 12 months that began prior to

the expiration of her insured status.  The Court finds no error in Judge Wurm's thorough analysis.

## IV.    CREDIBILITY DETERMINATION

In reviewing the ALJ's determinations of a claimant's credibility, the Court should "defer to

the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility."

Casias v. Sec'y of HHS, 933 F.2d 799, 801 (10th Cir. 1991).   Credibility determinations are

peculiarly within the province of the finder of  fact" and should not be upset when supported by

substantial evidence.  McGoffin v. Barnhart, 288 F.3d 1248, 1254 (10th Cir. 2002) (internal quotation

omitted).   Great deference should be given to the ALJ's conclusion as to credibility.   Kepler v.

Chater, 68 F.3d 387, 391 (10th Cir. 1995).  A claimant's testimony alone is insufficient to establish

the existence of disabling pain.  Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990).

The Tenth Circuit set forth the following framework to analyze subjective complaints of

disabling conditions:

> (1) whether the claimant established a pain-producing impairment by
> objective medical evidence; (2) if so, whether there is a 'loose nexus'
> between the proven impairment and the claimant's subjective
> allegations of pain; and (3) if so, whether, considering all the evidence,
> both objective and subjective, claimant's pain is in fact disabling.

Luna v. Bowen, 834 F.2d 161, 163-64 (10th Cir. 1987).  If the plaintiff satisfies the first two factors,

the ALJ must consider the assertions the plaintiff's assertions regarding subjective conditions and

decide whether they are credible.   In making such determinations, the following factors are

considered:  levels of medication and their effectiveness, the extent to which Plaintiff attempts to

obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of

credibility that are peculiarly within the judgment of the ALJ, the motivation and relationship between the claimant and other witnesses and the consistency or compatibility of non-medical testimony with objective medical evidence.  Huston v. Bowen, 838 F.2d 1125, 1132 (10th Cir. 1988);  Luna, 834 F.2d at 165-66.

The ALJ need not engage in a formalistic factor-by-factor recitation of the evidence.  Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000).  Findings of credibility, however, should be closely linked to substantial evidence and not just a conclusion in the guise of findings.  Kepler, 68 F.3d at 391.

Here, Judge Wurm acknowledged that in making his assessment, he must consider all of the symptoms, including a claimant's pain.  [Tr. at 14.]  He proceeded to discuss Casaus' specific complaints of tenderness around her left breast, her fears that the medication Tamoxifen might cause blood clots or liver problems in the future.  However, Casaus admitted that she had no functional side effects from the medication at that time.  She was right handed and only her left arm was affected by the tenderness in her left breast.  She could lift her left arm to a certain extent, actually above the head and was doing exercises to increase that range of motion.  [Tr. at 14.]

Judge Wurm also carefully considered Casaus very recent diagnosis of RA but noted that the medications seemed to be helping her arthritic pain.  The ALJ reviewed Casaus' daily activities, noting that she was able to visit with friends and get out of the house.  She was able to go to the grocery store and post office.  Casaus also mentioned that she went to church and could do crossword puzzles, as well as watch some television.  Judge Wurm stated that while he found her testimony sincere, he simply did not find that it supported her allegation of a complete disability.  In addition, the objective medical record supported the finding that Casaus was recovering from her

22

cancer and doing well with the arthritis.  That record also did not support a finding that Casaus completely disabled as she claimed to be.

In applying the deference it must, and in view of the fact that Casaus rarely even mentions symptoms of pain, the Court concludes that substantial evidence supports the ALJ's credibility findings.

## V.   **RFC FINDING**

"The burden is on the claimant to show that her impairment renders her unable to perform her past relevant work."  Henrie v. United States Dep't of Health & Human Services, 13 F.3d 359, 360 (10th Cir. 1993).  Here, Judge Wurm had a description of the way Casaus performed her past relevant work as well as information regarding her physical capabilities.  Moreover, he even had her concession that she believed she probably could perform her prior job as rural mail carrier.  A claimant is able to perform past relevant work if she can perform "[t]he actual functional demands and job duties of a particular past relevant job."  Andrade v. Sec'y of Health & Human Services, 985 F.2d 1045, 1050 (10th Cir. 1993) (internal citation omitted).

Casaus argues that Judge Wurm erred in evaluating her residual functional capacity or in concluding that she could engage in sedentary work.  The ALJ actually determined that Casaus retained the RFC for light exertional level with the limitations of only occasional fingering or fine manipulation.  [Tr. at 15.]  The ALJ appeared to reach this determination by considering the entire record, along with Casaus' recitation of daily activities, which have been discussed above.  In addition, the ALJ noted that Casaus testified that she would rather work than to "have something like this."  She also testified she believed she could perform the duties of her prior mail carrier job if she could actually obtain that job again, which she found doubtful.

The Court finds claimant's attorney's arguments to be meritless.  For example, her attorney implies that the ALJ did not review all of the physician's opinions in this case, and yet he cites opinions that do not really support Casaus' position.  For example, he asks "[w]here does the ALJ discuss Dr. Paul Pan's radiology report?"  Yet, that report only indicates mild osteoporosis of the bones of each hand and mild narrowing.  "No evidence of significant periarticular erosion is demonstrated."  The diagnostic conclusion is mild degenerative changes of the radiocarpal joints and mild osteoporosis of both hands "with no evidence of acute bony trauma or other focal pathology." [Tr. at 238.]  This record does not support counsel's position that the ALJ's RFC finding was erroneous or unsupported by substantial evidence.

Counsel next asks "[w]here does [the ALJ] discuss Dr. Turner's opinion?" and cites to transcript page 278 that does not exist.  Finally, counsel asks where the ALJ discusses "the agency's own jumbled-up opinion by the consulting physician? [Tr. 213-16] And the list goes on . . . " However, transcript pages 213-16 are merely the agency's internal notes as to the progress of the claimant's file and not the actual consultant's opinions.  One consultant's opinion is at transcript page 153 and is not "jumbled-up."   Nor is the psychiatric consultant's opinion "jumbled-up." [Tr. at 221.]

Casaus fails to come forward with no meritorious challenge to show that the ALJ's RFC finding was erroneous or unsupported by substantial evidence.

## VI.    ERROR IN CONCLUDING CASAUS COULD PERFORM HER PRIOR RELEVANT WORK

Casaus claims that Judge Wurm engaged in "simple trickery" to get her to testify that she could still perform the duties of her prior mail handler work.  The Court disagrees.  The following exchange occurred.

24

Question:      . . . Now explain to me, both, neither one of the jobs you've had in the past
               (INAUDIBLE) you did heavy exertion or, you know, it wouldn't be called, particular,
               strenuous jobs.  Why, why can't you do any of, either of those jobs?

Answer:        Because (INAUDIBLE).  That, that job is (INAUDIBLE).

Question:      Well, I'm not asking whether the job's open or you can get it.  I'm just asking why
               couldn't do it, why are you unable to do it?

Answer:        Because it's , everything's computerized now at that position.

Question:      Um-hum.  What about like the mail carrier job?

Answer:        The mail carrier is, that, that's hard where they have to deliver the mail.  Somebody
               else took place of it.  I had to give it up, so they had to hire somebody else.

Question:      Well, let's assume you could get the job, could you do it?

Answer:        Well, I probably could do it.  Bit it's, my place is Fort Sumner, which I don't think
               I could it.  The girl would be less– I'll tell you, I'd much rather work.

[Tr. at 37-37.]

        Casaus had testified earlier in the hearing that her rural mail carrier position was not a
strenuous or demanding position.  She basically sat and drove and delivered mail to ranches.  She did
not have to lift heavy packages.  The bundles she picked up were not very big and did not weigh more
than three pounds.  [Tr. at 27-28.]  Even then, she only had to lift that amount once a day when she
picked up the mail from the post office.  She did not have to get out of the car.  Instead, she could
drive right up to the mailbox.  [Tr. at 28.]

        At this stage, the burden of proof was on Casaus to show that she could not return to her past
relevant work.  Potter, 905 F.2d at 1349.  In this case, she did not sustain her burden by showing that

25

she was unable to perform the duties of either of her prior positions.  Indeed, she essentially admitted

she was able to do the work of a rural mail carrier.

Thus, the Court concludes that the ALJ did not commit any error in making his RFC

determination, that he did not engage in any "trickery" in questioning Casaus about her ability to

work as a rural mail carrier, and that substantial evidence supports his determination.

## VII.   <u>ERROR IN FAILURE TO APPLY GRIDS</u>

Casaus argues that it was uncontradicted that she had several physical limitations that "kicked

in the use of the GRIDS."  She further contends that she "lacked the RFC to do anything."  The

Court again fails to give much credence to this claim.  As stated above and admitted by Casaus, this

simply is not true.  She actually believed she could perform the duties of her prior jobs.  Moreover,

Casaus' argument here is somewhat suspect, if not simply inconsistent, in view of her other argument

that she had disabling arthritic pain and/or a disabling mental condition that would have precluded

an exclusive application of the grids.  *See* <u>Hargis v. Sullivan</u>, 945 F.2d 1482, 1490 (10th Cir. 1991)

(grids consider only exertional or strength impairments).

The Court agrees with the government that even if Casaus could have demonstrated that the

ALJ's step 4 findings were erroneous or unsupported, the next step would have been a remand for

the ALJ to proceed to step 5 and make the necessary determinations which might have required the

use of a vocational expert's testimony.

Thus, the Court rejects Casaus' argument that the grids should have been applied at this stage

in the proceeding, finds no error in the ALJ's failure to do so, and finds substantial evidence to

support the ALJ's determination at step 4.

## VIII.   **FAILURE TO DEVELOP THE RECORD**

It is beyond dispute that the burden to prove disability in a social security case is on the claimant.  However, "[a]n ALJ has the duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing." Carter v. Chater, 73 F.3d 1019, 1022 (10th Cir.1996). *See also* Henrie v. United States Dep't of Health & Human Servs., 13 F.3d 359, 360-61 (10th Cir. 1993); §§ 20 C.F.R.  404.944, 416.1444 (requiring ALJ to look fully into issues);  Social Security Ruling 96-7p, 1996 WL 374186, at *2 n. 3 (requiring ALJ to develop "evidence regarding the possibility of a medically determinable mental impairment when the record contains information to suggest that such an impairment exists").  This duty is heightened when the claimant proceeds *pro se*. *See* Henrie, 13 F.3d at 361.  Clearly, here, that duty is heightened as Casaus represented herself during the administrative law hearing.

Casaus argues that the ALJ's evaluation of her mental impairment was "mass confusion," that a consultative examination by a mental health expert should have been required and that her physical impairments were "grossly and regrettably evaluated very wrong."  Thus, she claims that the ALJ failed to adequately develop the record.

However, Casaus does not refer to any medical records that the ALJ failed to obtain or consider.  Instead, the basis of her argument appears to be that the ALJ should have ordered consultative medical exams, both in reference to her mental and physical impairments.

The ALJ "has broad latitude in ordering consultative examinations." Hawkins v. Chater, 113 F.3d 1162, 1166 (10th Cir. 1997).  Fur further examination to be required, there must be "some objective evidence in the record suggesting the existence of a condition [that] could have a material impact on the disability decision." Id. at 1167.  Where the record medical evidence is inclusive, "a

consultative examination is often required for proper resolution of a disability claim. Id. at 1166. However, a claimant's "[i]solated and unsupported comments . . . are insufficient." Id.

Here, the Court concludes that the ALJ adequately developed the record and committed no error in failing to order consultative exams. There was, at best, minimal references to Casaus' depression in the record. These meager references simply did not suggest the existence of a condition that might have a material impact on the disability decision. Moreover, most of the references to depression are isolated, subjective and unsupported by objective medical testing or evidence. There are no objective medical diagnoses of "major depression," for example. No doctor prescribed any anti-depressant medication. Casaus herself did not describe her depression or anxiety as disabling and did not appear to seek out any type of mental health counseling.

Consultant Gabaldon did evaluate Casaus' mental impairment and found nothing more than mild restrictions. This, too, is substantial evidence supporting the ALJ's decision not to order a consultative psychiatric evaluation. In other words, the Psychiatric Technique Form filled out by Gabaldon, does not suggest in any way that her depression or anxiety would have impacted the disability determination. In addition, Casaus' daily activities did not suggest that she was so mentally impaired that he could not work. She could groom herself, do some household chores, do some groceries, do some errands, visit friends, watch television and go to church.

Casaus failed to raise an issue to be developed by showing that her mental impairment was, on its face, substantial and in need of additional development of the record. Indeed, many, if not most, of the references to depression in the record are linked to her diagnosis of cancer. Thus, the depression, while both serious and significant, was situational in nature, rather than long-term and

28

chronic.  Casaus concedes that as of the time of her diagnosis of breast cancer she had never been treated for emotional or mental problems that limited her ability to work.  [Tr. at 73.]

      To the extent that Casaus also claims the ALJ should have obtained a consultative medical exam as to her physical impairments, the Court also rejects this argument.  The objective medical evidence shows that Casaus was treated successfully for her breast cancer, and that the impairment or limitations were not expected to be long-term in duration, other than the need for periodic monitoring.  The same is true for her arthritic condition which appeared to be well controlled by medication.

      Therefore, the Court concludes that under these circumstances, the record contained sufficient information for Judge Wurm to make an informed decision regarding Casaus' mental and physical functioning.  Casaus did not demonstrate that the ALJ violated his duty to develop the record, and substantial evidence supports his decision not to do so.

## Recommended Disposition

      That Casaus' Motion to Reverse Administrative Decision or, in the Alternative, a Remand of Said Decision [doc. 10] be DENIED and that this matter be dismissed with prejudice.

Lorenzo F. Garcia
Chief United States Magistrate Judge